**FILED**

JUL 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | |
|---|---|
| **REGINALD VANCE**<br>13409 Reid Circle<br>Ft. Washington, MD 20744 ) ) ) ) | |
| **Plaintiff,** ) ) | Case: 1:08-cv-01283<br>Assigned To : Friedman, Paul L.<br>Assign. Date : 7/25/2008<br>Description: TRO/PI |
| **v.** ) ) | |
| **DIRK KEMPTHORNE, SECRETARY<br>DEPARTMENT OF THE INTERIOR**<br>1849 C Street, NW<br>Washington, DC 20240 ) ) ) ) ) | **Jury Trial Demand** |
| **Defendant.** ) ) | |

## PLAINTIFF'S COMBINED MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

The Plaintiff Reginald Vance, by and through his attorneys, hereby moves this Court, pursuant to Local Rule 65 and the Federal Court Rules of Civil Procedure:

1.     To issue a temporary restraining order:

a.   restraining the Defendant from removing the Plaintiff from his position as Supervisory Management and Budget Analyst, GS-14; and

b.   directing the Defendant to remove Plaintiff from administrative leave and permit him to return to work pending the outcome of this matter;

2.     To issue a preliminary injunction:

a.   restraining the Defendant from removing the Plaintiff from his position as a Supervisory Management and Budget Analyst, GS-14; and

1

b.  directing the Defendant to remove Plaintiff from administrative leave and
permit him to return to work pending the outcome of this matter; and

c.  restraining the Defendant from continuing to retaliate against Mr. Vance
pending the final hearing and determination of this action.

The grounds for this motion, as are more fully and completely set forth in the attached
Memorandum of Points and Authorities, and the attached declaration of Mr. Vance.

This motion is based on these Motion papers and the accompanying Memorandum of
Points and Authorities, the attached declaration of Mr. Vance, as well as the complaint and all
other papers and records on file in this action, together with any argument or evidence that may
be presented at the hearing on this motion. Plaintiff certifies that he sought the consent of the
Defendant Kempthorne's consent to this motion and Defendant did not respond with his position
before this motion was filed.

### Certificate of Counsel

I hereby certify this 25th day of July 2008, that actual notice of the filing of the
~~Emergency Motion for Expedited Consideration and Hearing on~~ Plaintiff's Motion for
Preliminary Injunction and Motion for Temporary Restraining Order was served at 2:00 pm, and
the following pleadings were served, Plaintiff's Complaint, Emergency Motion for Expedited
Consideration and Hearing on Plaintiff's Motion for Preliminary Injunction and Motion for
Temporary Restraining Order and Order, Plaintiff's Motion for Preliminary Injunction and
Motion for Temporary Restraining Order and Order, Exhibit A (Plaintiff's Declaration) Exhibit
B (Settlement Agreement), Exhibit C (Notice of Proposed Removal) and Exhibit D (Official
Reprimand for AWOL) was sent electronically to counsel for Defendant listed below:

Jeffrey Taylor, U.S. Attorney District of Columbia
US. Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

Dated: July 25, 2008

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

# FILED

**JUL 2 5 2008**

**Clerk, U.S. District and Bankruptcy Courts**

| | |
|---|---|
| **REGINALD VANCE**<br>13409 Reid Circle<br>Ft. Washington, MD 20744<br><br>        **Plaintiff,**<br><br>        **vi.**<br><br>**DIRK KEMPTHORNE, SECRETARY**<br>**DEPARTMENT OF THE INTERIOR**<br>1849 C Street, NW<br>Washington, DC 20240<br><br>        **Defendant.** | Case No.    **08 1283**<br><br>**Jury Trial Demand** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S COMBINED MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION

The Plaintiff, Reginald Vance, by and through his attorney, hereby submits his Memorandum of Points and Authorities in support of the Plaintiff's motion, pursuant to Local Rule 65 and the Federal Court Rules of Civil Procedure: (1) To issue a temporary restraining order: (a) restraining the Defendant from removing Mr. Vance from his position with the Agency and (b) directing the Defendant to remove Plaintiff from administrative leave and permit him to return to work pending the outcome of this matter; (2) To issue a preliminary injunction: (a) restraining the Defendant from removing Mr. Vance from his position with the Agency; (b) directing the Defendant to remove Plaintiff from administrative leave and permit him to return to

3

work pending the outcome of this matter; and (c) restraining the Defendant from continuing to
retaliate against Mr. Vance pending the final hearing and determination of this action.

### Relevant Factual Background

Mr. Vance is employed as a GS-14 Supervisory Management and Budget Analyst, and is
the Chief of the Business and Finance Office in the Office of the Chief Information Officer at the
National Park Service. Complaint at 5; Ex. A, paragraph 1. Throughout his employment, Mr.
Vance received superior evaluations. Id.

In 2007, Mr. Vance reported to John Snyder, a Caucasian male and the Acting Chief
Information Officer. Complaint at 6. In 2007, Mr. Vance filed an internal complaint against the
Defendant alleging discrimination in employment, arising from treatment by his supervisor, John
Snyder. Id. On April 26, 2007, the parties entered into a Resolution Agreement. Id. The
Resolution Agreement provided, among other things that the Agency, through Snyder, would
invite Mr. Vance to budget meetings or inform him of pertinent information related to budget
issues; Snyder would schedule weekly meetings with Mr. Vance; Snyder would include Mr.
Vance in the weekly Tier 1 management meetings; Snyder would work to provide a suitable
office for Mr. Vance; and Mr. Vance would be permitted to pursue a detail. Id.

After execution of the Resolution Agreement, the Agency failed to complete any of the
terms of the Resolution Agreement. Complaint at 7. Mr. Vance was involuntarily transferred to
Herndon, Virginia by Snyder. Id. At the request of Snyder, the Agency also initiated an audit of
Mr. Vance's use of a government issued credit card. Id. The audit covered the period from 2000
through 2007. Prior to receiving Mr. Vance's explanation for any of the charges, the agency

referred the issue to the U.S. Attorney's Office for prosecution. The U.S. Attorney refused to prosecute the matter.

On July 25, 2007, Mr. Vance notified the Agency's Director of Civil Rights that the Agency was in breach of the Resolution Agreement and requested reinstatement of his complaint. Complaint at 8. The Agency has not taken any action on the breach of the agreement over the past year. Snyder retaliated against Mr. Vance by extending his involuntary detail for an additional sixty days in Virginia on August 28, 2007, as he vacated the Acting Chief Information Officer position, and returned to a position as Deputy Chief Information Officer. Id.

In January 2008, Mr. Vance was reassigned to Jeffery Compton, a Caucasian male, and Deputy Chief Information Officer. Complaint at 9. Between January 2008 and July 2008, Compton refused to communicate with Mr. Vance and refused to assign him any substantive work. Id.

On April 21, 2008, Compton proposed to remove Mr. Vance from employment for misuse of a government issued credit card. Complaint at 10. Compton submitted a proposal to remove Mr. Vance to Joseph L. Curran, Chief Information Officer. Id. Mr. Vance, through counsel, submitted a written rebuttal to Joseph Curran, where he disputed the charges of misuse of a government issued credit card. Ex. D. He did acknowledge approximately five incidents over a period of eight years where he inadvertently used the credit card for gas or food in the total amount of approximately $200. He offered to immediately reimburse the government for this oversight. Id.

Mr. Vance exercised his right to request an oral hearing on the proposal to remove him. Ex. A at 8. Curran ignored Mr. Vance's request for an oral hearing and refused to communicate

5

with him. Id.

On July 22, 2008, Curran issued a Decision to remove Mr. Vance from federal service, effective July 25, 2008, in response to the proposal to remove Mr. Vance. Ex. C. Mr. Vance was immediately placed on administrative leave. Mr. Vance was not afforded an oral hearing at any time before his termination. Ex. A at 9.

Mr. Vance was singled our for an audit of his credit card usage in an Agency with thousands of employees who have government issued credit cards. Ex. A at 10. As the Chief of the Budget and Finance Office, Mr. Vance is aware that there have been several incidents of Caucasian employees who used government issued credit cards which resulted in thousands of dollars of losses for the Agency, and those employees have not been terminated. Id.

It is clear that the Agency has violated material terms of the Resolution Agreement and violated his due process rights by denying him notice and an opportunity to be heard before his termination, and retaliated against Mr. Vance.

## II.   <u>Argument</u>

<u>This Court Should Grant the Plaintiff's Motion for a Temporary Restraining Order and for a Preliminary Injunction Because the Plaintiff Has Demonstrated a Likelihood of Success on the Merits, That Mr. Vance Will Suffer Irreparable Harm if the Injunctive Relief is Not Granted, That No Other Party Will Suffer Substantial Harm if the Injunctive Relief is Granted, and that the Public Interest Favors Granting the Relief Sought Herein</u>

The Plaintiff seeks a temporary restraining order ("TRO") and a preliminary injunction against the Defendant to restrain the Defendant from removing Mr. Vance from his position with the Agency.

A temporary restraining order ("TRO") serves "to preserve the status quo for a limited

period of time until the Court has the opportunity to pass on the merits of the demand for a preliminary injunction,"[1] and "to prevent imminent harm [to the movant] until a hearing on the request for a preliminary injunction may be held."[2]

The "traditional four-part test for injunctive relief applies to both an application for a TRO and to an application for a preliminary injunction,[3] and it requires that the movant show: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) other interested parties will not suffer substantial harm if the injunction is granted, and ; (4) that the public interest favors entry of a preliminary injunction."[4]

The court must balance these four factors, and "[a] court may balance weakness in one or more of the four factors against a particularly strong showing in one of the other factors," and therefore "injunctive relief 'may be justified ... where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable harm.'"[5]

At the TRO stage (as opposed to the preliminary injunction stage), even in the absence of such a "traditional" showing, a TRO's short duration, along with a showing of imminent harm

---

[1]Barrow v. Graham, 124 F.Supp.2d 714, 715-16, 2000 U.S. Dist. LEXIS 19007, **5-6 (D.D.C. 2000), citing Warner Bros. Inc. v. Dae Rim Trading, Inc., 877 F.2d 1120, 1125 (2d Cir. 1989); Fernandez-Roque v. Smith, 671 F.2d 426, 429 (11th Cir. 1982).

[2]Id., 124 F.Supp.2d at 716, 2000 U.S. Dist. LEXIS 19007 at **5 (citation omitted).

[3]Id., 124 F.Supp.2d at 716, 2000 U.S. Dist. LEXIS 19007 at **5-6.

[4]Role Models America, Inc. v. White, 193 F.Supp.2d 76, 79-80, 2002 U.S. Dist. LEXIS 3081, **10.

[5]Id., 193 F.Supp.2d at 80, 2002 U.S. Dist. LEXIS 3081 at **11, quoting Cityfed Fin. Corp. v. Office of Thrift Supervision, 313 U.S. App. D.C. 178, 58 F.3d 738, 747 (other citation omitted).

and an absence of a contrary showing from a respondent may together justify the grant of a TRO to preserve the status quo.[6]

Here, the Plaintiff has made a sufficient showing to meet the legal standard for both a TRO and a preliminary injunction, and this Court should grant the Plaintiff's motion.

### 1.   Likelihood of success on the merits

Here, after entering into a Resolution Settlement of a prior EEO complaint, the Defendant has breached material terms of the Resolution Agreement by:  1) failing to invite Mr. Vance to budget meetings or inform him of pertinent information related to budget issues; 2) failing to schedule weekly meetings with Mr. Vance; 3) failing to include Mr. Vance in the weekly Tier 1 management meetings; 4) failing to provide a suitable office for Mr. Vance and involuntarily detailing him to Virginia; 5) refusing to permit Mr. Vance to pursue a detail;  5) retaliating against Mr. Vance by treating him differently from other agency employees and subjecting him to an audit and by proposing to remove him without due process.

The Defendant's actions against Mr. Vance violate the Resolution Agreement and are clearly discriminatory and retaliatory and utterly without any basis in fact.  The Resolution Agreement provides that Mr. Vance would be invited to budget meetings, participate in weekly meetings with his supervisor, included in management meetings, and allowed to pursue a detail. However, shortly after executing the Resolution Agreement, Mr. Vance was denied all meetings with management and involuntarily transferred to Virginia.  The Agency has not carried out its obligations under the Resolution Agreement in good faith because it has singled Mr. Vance out

---

[6]Barrow v. Graham, 124 F.Supp.2d at 716, 2000 U.S. Dist. LEXIS 19007 at **5-6.

for an audit of his use of a government issued credit card; proposed to remove him for inadvertent use of a government issued credit card on approximately five occasions over a period of eight years; and is attempting to remove him without providing his due process rights. There is absolutely no factual basis or legal authority for the Defendant's actions, and the actions are direct violations of the letter and spirit of the Resolution Agreement. Mr. Vance has demonstrated a very strong likelihood of success on the merits with regards to the illegality of the Defendant's actions. This Court should grant his motion.

## 2.    Irreparable injury in the absence of the requested relief

The second prong of the "traditional four-part test" requires that the movant demonstrate that he will suffer irreparable harm if the equitable relief is not granted. Irreparable injury is a sine qua non; without a showing of irreparable injury—even a "relative slight showing"—a court will not grant injunctive relief.[7]

Mr. Vance will be denied his constitutional rights and will be removed from his position with the federal government after 8 years of federal service by the Defendant if the court does not intervene and issue the temporary restraining order and preliminary injunction. Mr. Vance's income is the sole income supporting his household. Without Mr. Vance's income, his family will not be able to pay its bills on time (or at all) and buy the necessities the family requires to sustain itself. He faces financial disaster without the income from his position with the Defendant. Mr. Vance will be irreparably harmed, even should he prevail and obtain a judgment

---

[7]Role Models America, Inc. v. White, 193 F.Supp.2d 76, 80, 2002 U.S. Dist. LEXIS 3081, **11-12, quoting Cityfed Fin. Corp. v. Office of Thrift Supervision, 313 F. App. D.C. 178, 58 F.3d 738, 747 (D.C. Cir. 1995) (internal quotation omitted).

against the Defendant in this action, if this Court does not restrain the Defendant and prevent it from carrying through with these constitutional violations, and discriminatory and retaliatory, unlawful acts.

Mr. Vance has demonstrated that he will suffer irreparable harm if the relief he seeks in this motion is not granted.

### 3.     Other interested parties will not suffer substantial harm if the injunction is granted

If Mr. Vance's motion for a TRO and for a preliminary injunction are granted, the Defendant will have to refrain from removing him from federal service after eight years of federal service until the court addresses the motion for a preliminary injunction. No one will suffer any harm, let alone significant harm, if the Agency is required to refrain from removing Mr. Vance from federal service.

Mr. Vance has demonstrated that no other interested party will suffer significant harm if this Court grants him the injunction he seeks in this motion.

### 4.     The public interest favors a grant of injunctive relief

The Defendant's actions against Mr. Vance after he settled his prior complaint are noted above. The public interest requires the protection of men like Mr. Vance, who are brave enough to step forward and combat discrimination when they encounter it.

Although preserving the status quo would require the Defendant to refrain from removing Mr. Vance from his federal position and return him from administrative leave, that is the Defendant's own doing. Mr. Vance entered into a Resolution Agreement in good faith and has

10

attempted to complete his work, but the Agency has breached material terms of the Resolution Agreement and has not allowed him to perform his newly assigned duties and does not intend to do so. A clear example is Mr. Vance's involuntary transfer after signing the Resolution Agreement. Further, there is no justification for denying him an oral hearing and opportunity to be heard before issuing a decision to remove him. It is the Defendant's unlawful, irrational, unconstitutional, retaliatory and discriminatory actions that resulted in Mr. Vance being proposed for removal.

It is clearly in the public interest for this Court to grant Mr. Vance the injunctive relief he seeks.

III.    **Conclusion**

Mr. Vance has demonstrated that he is likely to succeed on the merits, that he will suffer irreparable harm if injunctive relief is not granted, that no other party will suffer significant harm if the injunctive relief is granted, and that the public interest favors enjoining the Defendant. This Court should grant Mr. Vance's motion.

11

Respectfully submitted,

By:                    /s/
David A. Branch #438764
Law Office of David A. Branch, P.C.
1825 Connecticut Avenue, NW #690
Washington, D.C.  20009
        (202) 785-2805
Attorney for Plaintiff

## Certificate of Counsel

I hereby certify this 25th day of July 2008, that actual notice of the filing of the Emergency Motion for Expedited Consideration and Hearing on Plaintiff's Motion for Preliminary Injunction and Motion for Temporary Restraining Order was served at 3:00 pm, and the following pleadings were served, Plaintiff's Complaint, Emergency Motion for Expedited Consideration and Hearing on Plaintiff's Motion for Preliminary Injunction and Motion for Temporary Restraining Order and Order, Plaintiff's Motion for Preliminary Injunction and Motion for Temporary Restraining Order and Order, Exhibit A (Plaintiff's Declaration) Exhibit B (Settlement Agreement), Exhibit C (Decision on Proposed Removal) and Exhibit D (Plaintiff's Written Response to Proposed Removal) on counsel for Defendant listed below:

Jeffrey Taylor, U.S. Attorney District of Columbia
U.S. Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

## Certificate of Service

I hereby certify this 25th day of July 2008, that a copy of the foregoing Plaintiff's Motion for Preliminary Injunction and Motion for Temporary Restraining Order was sent electronically to counsel for Defendant listed below:

U.S. Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

12

/s/

David A. Branch

# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **REGINALD VANCE** ) | |
| **13409 Reid Circle** ) | |
| **Ft. Washington, MD 20744** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.** |
| ) | |
| **DIRK KEMPTHORNE, SECRETARY** ) | **Jury Trial Demand** |
| **DEPARTMENT OF THE INTERIOR** ) | |
| **1849 C Street, NW** ) | |
| **Washington, DC 20240** ) | |
| ) | |
| **Defendant.** ) | |

## Sworn Declaration of Reginald Vance

I, Reginald Vance, the Plaintiff in this lawsuit, hereby make the following declaration pursuant to the provisions of 28 U.S.C. Sec. 1746. I understand that this declaration is the equivalent of an affidavit. The statements contained herein are based on my personal knowledge.

1.    I am an African American male, with eight years of federal service at the National

Park Service, U.S. Department of the Interior.

2.    I am employed as a GS-14 Supervisory Management and Budget Analyst, and

serve as the Chief of the Business and Finance Office in the Office of the Chief

Information Officer at the National Park Service. Throughout my employment, I have

received superior evaluations.

3.    In 2007, I reported to John Snyder, a Caucasian male and the Acting Chief

Information Officer. In 2007, I filed an internal complaint against the National Park

Service alleging discrimination in employment, arising from discriminatory treatment

**08 1283**

**FILED**

JUL 25 2008

**Clerk, U.S. District and Bankruptcy Courts**

my supervisor, John Snyder. On April 26, 2007, the Agency and I entered into a Resolution Agreement. John Snyder signed the Resolution Agreement on behalf of the Agency. The Resolution Agreement provided, among other things that the Agency, through Snyder, would invite me to budget meetings or inform me of pertinent information related to budget issues; Snyder would schedule weekly meetings with me; Snyder would include me in the weekly Tier 1 management meetings; Snyder would work to provide a suitable office for me; and I would be permitted to pursue a detail.

4.      After execution of the Resolution Agreement, the Agency failed to complete any of the terms of the Resolution Agreement. In June 2007, I was involuntarily transferred to Herndon, Virginia by Snyder. At the request of Snyder, the Agency also initiated an audit of my use of a government issued credit card. The audit covered the period from 2000 through 2007. Prior to receiving my explanation for any of the charges, the Agency referred the issue to the U.S. Attorney's Office for prosecution. The U.S. Attorney refused to prosecute the matter.

5.      On July 25, 2007, I notified the Agency's Director of Civil Rights that the Agency was in breach of the Resolution Agreement and requested reinstatement of my complaint. The Agency has not taken any action on the breach of the agreement over the past year. Snyder retaliated against me by extending my involuntary detail for an additional sixty days in Virginia on August 28, 2007, when he vacated the Acting Chief Information Officer position, and returned to a position as Deputy Chief Information Officer.

6.      In January 2008, I was reassigned to Jeffery Compton, a Caucasian male, and Deputy Chief Information Officer, even though my position description required me to report to the Chief Information Officer. Between January 2008 and July 2008, Compton

2

refused to communicate with me and refused to assign me any substantive work.  I

believe I was transferred under the Deputy Chief Information Officer so that a proposal to

remove me would be resolved within that office, rather than outside of the office, which

would have occurred if the Chief Information Officer proposed the discipline.

7.    On April 21, 2008, Compton proposed to remove me from employment for

misuse of a government issued credit card.  Compton submitted a proposal to remove me

to Joseph L. Curran, Chief Information Officer.  Through counsel, I submitted a written

rebuttal to Joseph Curran, where I disputed the charges of misuse of a government issued

credit card.  I did acknowledge approximately five incidents over a period of eight years

where I inadvertently used the credit card for gas or food, in the total amount of

approximately $200.  I offered to immediately reimburse the government for this

oversight.

8.    I exercised my right to request an oral hearing on the proposal to remove me.

Curran ignored my requests for an oral hearing and refused to communicate with me.

9.    On July 22, 2008, Curran issued a Decision to remove me from federal service,

effective July 25, 2008, in response to the proposal to remove me prepared by Compton.

I was immediately placed on administrative leave.  I  was not afforded an oral hearing at

any time before the date of termination.

10.    I was singled our for an audit of my credit card usage in an Agency with

thousands of employees who have government issued credit cards.  As the Chief of the

Budget and Finance Office, I am aware that there have been several incidents of

Caucasian employees who used government issued credit cards which resulted in

3

thousands of dollars of losses for the Agency, and those employees have not been terminated

11.    I believe the Defendant has breached material terms of the Resolution Agreement, and retaliated against me for filing the prior EEO complaint, and violated my constitutional rights by failing to provide me with notice and an oral hearing in the proposal to remove me from federal service.

Further declarant saith not.

4

I declare under penalty of perjury that the statements contained in the foregoing

declaration are true and correct.

*Reginald E. Vance*    7/25/08

Reginald Vance                              Date

# Exhibit B



# United States Department of the Interior

**NATIONAL PARK SERVICE**
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO.

## RESOLUTION AGREEMENT

## UNITED STATES DEPARTMENT OF THE INTERIOR

| | |
|---|---|
| **Reginald Vance** | ) |
| | ) |
| v. | ) |
| | ) |
| **U.S. Department of the Interior** | ) |
| **National Park Service** | ) |

**Agency No. (NPS-07-0173)**

**08 1283**

In accordance with the terms set forth herein below, the parties hereby agree to resolve the above-captioned complaint of discrimination.

By executing this Resolution Agreement the parties hereby agree to resolve all of the issues raised in <u>Reginald Vance</u> (hereinafter, the Complainant) complaint of discrimination in the above-captioned matter, including all claims of monetary reimbursement, and any other claims for relief, whether referenced herein or not, whether known or unknown and all other personnel claims, which have been filed or could have been filed by him against the U.S. Department of the Interior or any of its Bureaus and Offices (hereinafter, the Agency) through the date of execution of this Resolution Agreement.

**FILED**

The issues in the complaint resolved by this Resolution Agreement are as follows:

**JUL 2 5 2008**

1. Complainant alleged he was discriminated against on the basis of (color – Black (age, 40 District and 41) and subjected to a continuous hostile work environment for not receiving communication and respect, for the way his office was audited, and for getting a smaller office space than the criteria for a GS-14, supervisory manager.

Clerk, U.S. District and Bankruptcy Courts

The parties mutually agree to the following terms and further agree that these terms shall fully and forever resolve Complainant's allegations of discrimination against the Agency, and that except as specified herein, no other promises, conditions or obligations are made by or imposed on the parties:

1. By executing this Resolution Agreement, Complainant withdraws and dismisses, with prejudice, his complaint of discrimination identified above, and any other allegation, complaint, grievance or other action he has filed or could have filed and agrees not to

institute, file or otherwise initiate or cause to be instituted, filed or initiated on his behalf, any complaint or other action, including civil court litigation, against the Agency, its bureaus, offices, agents or employees which has or could have been filed by him through the date of execution of the Resolution Agreement.

2. The Complainant understands and agrees that he will receive no relief or other consideration beyond that recited in this Resolution Agreement, and that his acceptance of this shall be final and conclusive.

3. The complainant shall bear his own costs including attorney's fees relating to this matter.

4. The Complainant stipulates that his right to seek counsel in connection with waiving his Age Discrimination in Employment Act (ADEA) claims and stipulates further that he has been advised he or she has seven (7) days after signing this Resolution Agreement in which to withdraw his acceptance of its terms and provisions and that this period is deemed reasonable by the parties. The Complainant also stipulates that he has entered into this Resolution Agreement knowingly and willingly, with the intent of waiving any ADEA claims he or she may have against the Agency, and that there is adequate consideration for the agreement.

## ACCORDINGLY, THE AGENCY AGREES TO:

1. To invite the Complainant to the WASO Budget Meetings or inform the Complainant of the pertinent information related to the budget issues starting April 30, 2007.

2. To include Budget as an agenda item in the All OCIO Employees Meeting starting April 30, 2007.

3. The Complainant and Management agree to meet weekly. The meetings will be scheduled through the Lotus Notes Calendar to discuss on-going activities starting on the week of April 30, 2007.

4. To include the Complainant for the last 20 minutes of the Tier 1 weekly management meetings beginning April 30, 2007.

5. To change the Complainant's work schedule to 10 hour days, Monday through Thursday, 7:00 a.m. to 5:30 p.m., telecommuting on Mondays beginning April 30, 2007 and ending October 30, 2007. The telework agreement will be prepared and be signed by May 11, 2007.

6. Grant 1 hour of Administrative Leave on Wednesdays beginning April 30, 2007 and ending October 30, 2007.

7. To allow the Complainant to pursue a detail (not to exceed 120 days) and/or an IPA (Intergovernmental Personnel Ability Program) Opportunity for 1 year, only if the OCIO selects a candidate by October 2007 to backfill Complainant's position with a qualified employee at no cost to the OCIO.

8. Management agrees to work with the Office of Assistant Director, Business Services, to identify an office on the 8th floor for the Complainant that meets the right size requirement for a GS-14, Supervisory Manager starting on April 30, 2007 and for the move to be completed by June 15, 2007.

9. John Snyder, Acting Chief Information Officer, will be responsible for ensuring that the actions in this agreement will take place as specified.

## ACCORDINGLY, THE COMPLAINANT AGREES TO:

1. By executing this Resolution Agreement, Complainant withdraws and dismisses, with prejudice, his complaint of discrimination identified above, and any other allegation, complaint, grievance, controversion of Worker's Compensation claim, or other action he has filed or could have filed and agrees not to institute, file or otherwise initiate or cause to be instituted, filed or initiated on her behalf, any complaint or other action, including civil court litigation, against the Agency, its bureaus, offices, agents or employees which has or could have been filed by her through the date of execution of the Resolution Agreement.

2. The Complainant understands and agrees that he will receive no relief or other consideration beyond that recited in this Resolution Agreement, and that his acceptance of this shall be final and conclusive.

3. The Complainant shall bear his own costs including attorney's fees relating to this matter.

4. The Complainant agrees to submit a weekly report of activities to Management by close of business every Friday, beginning April 30, 2007.

That this Resolution Agreement shall not constitute or be construed as an admission of liability or wrongdoing by the Agency, but is for the purpose of resolving disputed claims.  Upon compliance and or payment of the items and/or amounts set forth in this Resolution Agreement, the Complainant waives and releases the Agency in full from any claims or causes of action for back pay, damages, interest or attorney's fees, which he raised or could have raised through the date of this Resolution Agreement.

That the parties to this Resolution Agreement warrant that they have not assigned or transferred any of the claims released herein to other person, parties or entities.

That the parties agree that should the Agency fail to honor its obligations as set forth in this Resolution Agreement for 29 CFR 1614.504 shall govern.  If the Complainant believes that the Agency has failed to comply with the terms of a settlement agreement or final decision, the Complainant shall notify the Director, Office of Civil Rights, Office of the Secretary, in writing, of the alleged noncompliance within 30 days of when the Complainant knew or should have known of the alleged noncompliance.  The Complainant may request that the terms of the settlement agreement be specifically implemented or alternatively, that the complaint be reinstated for further processing from the point processing ceased.

4

That this Resolution Agreement contains the complete understanding between the parties. The parties have no other oral or written agreements or understandings. That this Resolution Agreement is entered into voluntarily and with full understanding of its terms.


Reginald Vance, Complainant                    4/30/07
                                               Date


John Snyder, Acting Chief Information          4/26/07
Officer                                        Date


Dianne A. Spriggs, EEO Program                 4/26/07
Manager                                        Date

# Exhibit C



# United States Department of the Interior

NATIONAL _ PARK SERVICE
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:
P36(2420)

**JUL 22 2008**

Memorandum

To:       Reginald E. Vance
          Supervisory Management and Program Analyst

From:     Larry Curran            "         I-
          Chief Information O Icer           ~

Subject:  Decision on Proposed Removal

On April 21, 2008, Mr. Jeffrey S. Compton, Deputy Chief Information Officer,
Office of the Chief Information Officer (OCIO), informed you of his proposal to
remove you from your position as Supervisory Management and Program
Analyst, GS-0343-14, Office of the Chief Information Officer, National Park
Service (NPS) and the Federal service. The reason for proposing this action was
due to your misuse of a government-issued charge card.

I have carefully considered all of the documents contained in the evidence file,
including the Office of Inspector General (OIG) Report of Investigation, your
written response to the proposed removal dated May 16, 2008 and the proposed
removal.. Based on the reasons set forth below, I have decided that the charge
of misuse of a government charge card is sustained by preponderant evidence
and that the penalty of removal is appropriate and will promote the efficiency of
the service.

## Background

You have been employed as a Supervisory Management and Program Analyst,
GS-0343-14, and have served in the role as Chief, Office of Business and
Finance, for the Office of the Chief Information Officer (OCIO) since December
14,2003. You served as the principal business and financial manager for the
OCIO and provided budgetary support and advisory services to all NPS program
areas in Washington, DC and 391 park sites.

Between January 2004 and April 2007, you served as the Agency Organizational
Point of Contact (AIOPC) responsible for the government charge card program
for OCIO. You had oversight of all OICO expenditures and were responsible for

**08 1283**

# FILED

**JUL 25 2008**

**Clerk, U.S. District and
Bankruptcy Courts**

ensuring that funds were appropriately spent, and that OCIO employees were in compliance with government regulations and policies regarding use of government-issued charge cards. You also served as the Point of Contact to the Bank of America if there were any problems with OCIO employees being delinquent on their government-issued charge card accounts.

In January 2007, an audit conducted by the Accounting Operations Center revealed possible misuse of your government-charge card. As a result of these findings, you were relieved of your responsibility for the charge card program in April 2007. The Office of Inspector General (OIG) opened an investigation into these allegations on June 29,2007. OIG concluded that you had no supporting documentation for multiple charges on your government issued card and that you appeared to have used your government-issued charge card for personal use.

The findings of the OIG investigation were presented to the Department of Justice (DOJ), regarding the theft of official Department of Interior funds, in violation of 18 United States Code 641. After a review of the case, DOJ decided to decline prosecution and referred the matter back to the Agency for administrative action.

## Charge: Misuse of a government-issued charge card

Specification 1: On July 17, 2001, there was a charge on your government-issued charge card for Talkeetna Roadhouse in the amount of $9.85. OIG was unable to find a travel voucher or receipt for that time period, and you were not able to produce any supporting authorizing documentation for the charge.

Specification 2: On July 19, 2001, there was a charge on your government-issued charge card for Denali Manor Bed and Breakfast in the amount of $215.57. OIG was unable to find a travel voucher or receipt for that time period and you were not able to produce any supporting authorizing documentation for the charge.

Specification 3: On March 27, 2002, there was a charge on your government-issued charge card for Chevron in Cantwell, Alaska in the amount of $27.01. OIG was unable to find a travel voucher or receipt for that time period and you were not able to produce any supporting authorizing documentation for the charge.

Specification 4: On July 7,2002, while you were on government travel to Stone Mountain, Georgia, there was a charge for the Hampton Inn in the amount of $94.08 on the same night there was a charge for the Hilton Airport in the amount of $96.99. You were not able to provide an explanation for the secondary charge or any supporting authorizing documentation for the charge.

2

**Specification 5:** On June 23, 2003, there was a charge on your government-issued charge card for Aramark Skyland 6, in Luray, Virginia in the amount of $110.00. OIG was unable to find a travel voucher or receipt for that time period and you were not able to produce any supporting authorizing documentation for the charge.

**Specification 6:** On July 28, 2003, there was a charge on your government-issued charge card for personal use of a rental car in Baton Rouge, Louisiana., in the amount of $67.98. You later had to reimburse the government for this amount because it was not an authorized charge on your government-issued charge card.

**Specification 7:** On August 11, 2003, there was a charge on your government-issued charge card for personal use of a rental car in Washington, D.C., in the amount of $115.89. You later had to reimburse the government for this amount because it was not an authorized charge on your government-issued charge card.

**Specification 8:** On September 21,2003, there was a charge on your government-issued charge card for personal use of a rental car in Baton Rouge, Louisiana, in the amount of $52.76. You later had to reimburse the government for this amount because it was not an authorized charge on your government-issued charge card.

**Specification 9:** On March 29, 2004, there was a charge on your government-issued charge card for Texaco in Fort Washington, Maryland, near your home, in the amount of $17.00. This was not an authorized charge. You were not able to produce any supporting authorizing documentation for the charge.

**Specification 10:** On April 2, 2004, there was a charge on your government-issued charge card for Sunoco in Ocean City, Maryland, in the amount of $24.00. This was not an authorized charge. You were not able to produce any supporting authorizing documentation for the charge.

**Specification 11:** On July 4, 2004, there was a charge on your government-issued charge card for Safeway in Fort Washington, Maryland, near your home, in the amount of $51.25. This was not an authorized charge. You were not able to produce any supporting authorizing documentation for the charge.

**Specification 12:** On September 19, 2004, there was a charge on your government-issued charge card for a Texaco station in Fort Washington, Maryland, near your home, in the amount of $31.00. This was not an authorized charge. GIG was unable to find a travel voucher or receipt for

that time period and you were not able to produce any supporting authorizing documentation for the charge.

**Specification 13:** On March 24, 2005, there was a charge on your government-issued charge card for Red Star Restaurant in Largo, Maryland in the amount of $77.75. This was not an authorized charge. You were not able to produce any supporting documentation for the charge.

**Specification 14:** On August 5,2005, there was a charge on your government-issued charge card for CITGO in Tampa, Florida in the amount of $29.00. At the time, you were on government travel in Orlando, Florida, over 80 miles away. This was not an authorized charge. You were not able to produce any supporting authorizing documentation for the charge.

**Specification 15:** On August 17, 2005, there was a charge on your government-issued charge card for Barnes and Noble in Washington, DC in the amount of $67.21. This was not an authorized charge. You were not able to produce any supporting authorizing documentation for the charge.

**Specification 16:** On August 19, 2005, there was a charge on your government-issued charge card for Safeway in Fort Washington, Maryland, near your home, in the amount of $32.84. This was not an authorized charge. You were not able to produce any supporting authorizing documentation for the charge.

**Specification 17:** On November 9,2005, there was a charge on your government-issued charge card for Sunoco in Cherry Hill, New Jersey in the amount of $50.00. OIG was unable to find a travel voucher or receipt for that time period and you were not able to produce any supporting authorizing documentation for the charge.

**Specification 18:** On March 24, 2006, there was a charge on your government-issued charge card for four (4) days of personal use of a rental car in New Orleans, Louisiana, in the amount of $169.50. You later had to reimburse the government for this amount because it was not an authorized charge on your government-issued charge card.

**Specification 19:** On May 22, 2006, there was a charge on your government-issued charge card for Pride of America gas station in Fort Washington, MD, near your home, in the amount of $45.00. The same day, you began travel for a conference in Baltimore, Maryland, and claimed reimbursement for personal miles on your travel voucher. You were not entitled to receive double reimbursement for your travel.. You

4

told OIG that you had repaid the charge to the government. . However, AOC records show that you did not repay that amount..

**Specification 20:** On November 24,2006, there was a charge on your government-issued charge card for Office Depot in Baton Rouge, Louisiana, in the amount of $71.99. You were on personal travel and this was not an authorized charge. You were not able to produce any supporting authorizing documentation for the charge.

**Specification 21:** On November 28,2006, there was a charge on your government-issued charge card for Best Western in Baton Rouge, Louisiana in the amount of $178.00. You were on personal travel and this was not an authorized charge. You were not able to produce any supporting authorizing documentation for the charge.

**Specification 22:** On December 3,2006, there was a charge on your government-issued charge card for Hertz Rent a Car in Baton Rouge, Louisiana in the amount of $462.99. You were on personal travel at the time. You later had to reimburse the government for this amount because it was not an authorized charge on your government-issued charge card.

## Findings

You do not dispute that you misused your government-issued charge card as charged in Specifications 9,10,11,12,13,16,19,21      and 22. As a defense, you argue that in some of these instances you inadvertently used your government-issued card for personal use because it is similar in appearance to your personal credit card. However, this misuse occurred on several different occasions. In your position, you should have known the importance of ensuring that you were using your government-issued charge card in the proper capacity. Moreover, each government-issued charge card is clearly marked as being a government-issued charge card, "For Official Government Use Only."

In addressing Specifications 6,7, 8, and 18 in your written reply, you state that your actions were proper because personal use of a rental vehicle following government-authorized travel is an acceptable practice as long as the employee reimburses the government for the personal use. However, this has never been condoned in the policy guidelines for the government-issued charge card program. Pursuant to the Department of the Interior, Integrated Charge Card Policy Manual, 2.4 Restrictions and Limitations, all employees are required to close-out the car rental contract which was used during authorized travel and establish a new car rental contract using the employee's personal charge card. That section specifically states that "[t]he card must not be used to purchase any of the following: 1) Fuel for a privately owned vehicle. (Mileage reimbursements include the cost of fuel); 2) Personal or unofficial rental vehicles. (Charges must be paid separately with personal funds)." As the AJOPC, you received specific

5

training on authorized uses of a government-issued charge card and you should have known that the charge card could not be used for renting personal vehicles, regardless of what Dom Nessi told you.

In your written response, you state that Specifications 1,2, 3,4, 5, 15, 17 and 20 all involved authorized expenditures and do not represent improper use of your government-issued charge card. I note that during the Office of Inspector General Investigation you were requested to provide documentation and failed to do so. It was only after the issuance of the proposed removal you became forthcoming with documentation to address the allegations of misuse. In any event, you have failed to provide any supporting documentation for the charge in Specification 3.

The record shows that, since 2000, you repeatedly used your government-issued charge card for unauthorized transactions for your personal use. Your use of the charge card was improper and constitutes misuse.

I therefore sustain the charge of misuse of a government-issued charge card and Specifications 3,6,7,8,9,10,11,12,13,14,16,18,19,21, and 22.

The U.S. Department of Interior Integrated Charge Card Bulletin #4 - Charge Card Misuse states that charge card misuse will result in suspension or cancellation of an employee's account, and disciplinary action against the employee, up to and including removal.. The NPS Penalty Selection Guidance for Misuse of Government Issued Charge Cards clearly states that "Supervisors and managers who misuse government-issued charge cards are also held to a higher standard than the general population of employees."

As the deciding official, I have considered the factors set forth in Douglas v. Veteran's Affairs Administration, 5 M.S.P.R.. 280 (1981) when determining the penalty of removal..

*(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical, or inadvertent, or was committed maliciously for gain, or was frequently repeated.*

Your misconduct goes to the very heart of your position as Afope. You served as the AfoPC with oversight over the government charge card program for oClo. This required you to ensure cardholders complied with charge card regulations and policies and did not engage in any misuse of the charge card. You were also responsible for ensuring that employees were not delinquent on their payments and taking prompt and appropriate corrective and/or disciplinary action against cardholders in any instance of delinquency or misuse. Your conduct was expected to be above reproach in regard to the policy and procedures governing the use of the government-issued charge card. However,

6

you repeatedly violated the very policies that you were expected to enforce by using your government charge card for personal use, failing to provide required receipts. You continued to engage in misuse of your card even after being told you needed to reimburse the government for certain charges, which indicates that your misuse was intentional.. Additionally, as supervisor and manager you are charged with the responsibility to monitor and propose discipline or adverse actions for employees found to have misused government issued charge cards. Your misconduct is a serious breach of the trust placed in you and your responsibilities overseeing the charge card program.

*(2) The employee's past work record, including length of service, performance on the job, ability to get along with the follow workers and dependability. .*

You have worked for the National Park Service for almost eight (8) years and received a rating of 3.6 out of 4 on your most recent evaluation. However, this does not outweigh the serious and repeated misconduct..

### (3) Past Disciplinary Record

You acknowledged that you previously received a reprimand regarding your charge card use. However, I believe that the seriousness of the charges and the fact that you repeatedly violated the guidelines of the government-issued charge card program for which you had direct responsibility to enforce outweigh this factor.

*(4) The effect of the offense upon your ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties.*

You occupy a position that requires you to be trustworthy and honest.. You were responsible for overseeing compliance with charge card policies, yet you were failing to comply with the policies yourself. Your actions have caused your supervisor to lose all trust and confidence in your ability to satisfactorily perform your assigned job responsibilities. I consider this to be an aggravating factor.

*(5) The consistency of the penalty with those imposed upon other employees for the same or similar offenses.*

You stated that you were aware of at least two instances in which similarly situated employees engaged in far more egregious credit card misuse but only received reprimands. However, this is not true. There are no other employees who had oversight for the government charge card program who have engaged in similar credit card misuse.

7

*(6) The consistency of the penalty with any applicable agency table of penalties.*

In the Department's Table of Penalties, the Department's suggested penalty for misuse of a government-issued charge card ranges from a written reprimand to a 30-day suspension for the First Offense. The Table does not mandate the use of specific penalties; supervisors retain authority to set penalties they deem appropriate, based on the particular circumstances and specifications of the offense. I believe that the circumstances of this case justify the penalty of removal, because you repeatedly and intentionally violated the regulations and policies that you were responsible for enforcing.

Additionally, the U.S. Department of Interior Integrated Charge Card Bulletin #4 - Charge Card Misuse states that charge card misuse will result in suspension or cancellation of an employee's account, and disciplinary action against the employee, up to and including removal.. Since you were responsible for oversight of the charge card program, you knew the ramifications of misusing your card.

*(7) The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question.*

You were on notice as early as December 2000, as noted in the OIG interview with Connie Dworak where she identified the December 21,2000 charge of $309.58 to Auto Zone in Pittsburg, California and the December 22,2000 charge of $139.50 to Delta Auto Service in Pittsbu rg, Californ ia as the amou nts you improperly charged to your government-issued charge card. You stated in the OIG Report of Investigation, "He (Tom Ferranti) explained to me that was not acceptable, although I was on travel, he understood the situation. I wasn't expected to be stuck out in the cold, driving from Alaska to Louisiana, but not to pay for auto services on the government charge card." You were aware at that time what constituted misuse yet you chose to repeat that misuse.

You are responsible for oversight of the charge card program within OCIO, and in ensuring compliance with charge card policies. On April 19, 2004, you completed a 001 Cardholder's Training Course concerning the use of the government-issued charge card for both purchase and travel.. You received your initial Department of the Interior's on-line computer training for Approving Officials on January 5, 2006 and refresher training on January 30, 2008. When you received your government-issued charge card, a statement titled "Agreement between the Department of the Interior Employee and Bank of America, N.A. (USA)'" was included with that card. This document explicitly advised you that use of the charge card is limited to "official purchase, travel, fleet and official related charges in accordance with your Agency/Organization policy" and may not be used for "personal, family or household purposes." The fact that in your position you had responsibility to ensure other employees were in compliance and did not misuse their government-issued charge card shows that you were

8

aware of or should have known that your actions were in violation of the very rules you were tasked to enforce. I consider this to be an aggravating factor.

*(8) Potential for the employee's rehabilitation*

The fact that you repeatedly violated policies you were responsible for enforcing leads me to conclude that you would not be a good candidate for rehabilitation. While you argue that you stopped misusing your card as soon as you were reprimanded, the Agency has found no record of a reprimand.

*(9) Mitigating circumstances surrounding the offense such* as *unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part* of *others involved in the matter*

I am not aware of any mitigating circumstances.

*(10) The adequacy and effectiveness* of *alternative sanctions to deter such conduct in the future by the employee or others.*

I have concluded that a lesser penalty, such as a suspension, would not be sufficient to deal with your egregious misconduct.. I believe that your removal from the Service is the appropriate action.

## Penalty Decision

Based on my consideration of the record of evidence, I find that you have committed the misconduct, and sustain the charges of misuse of a government-issued charge card. I find that the proposal to remove you as a Supervisory Management and Program Analyst, GS-0343-14, Office of the Chief Information Officer, National Park Service and from Federal service is warranted. Therefore to promote the efficiency of the Service, your removal will be effective on Friday, July 25,2008.

## Your Rights

You have the right to appeal this suspension to the Merit Systems Protection Board (MSPB) within thirty (30) calendar days of the effective day of your removal.. You are advised to review 5 C.F.R.. § 1201.22 concerning timeliness of appeals. Attachment 1 is a copy of the MSPB practices and procedures, and attachment 2 is a copy of the MSPB appeal.. These can also be found at the MSPB website, www.mspb.gov.. The mailing address for cases under the jurisdiction of the Washington DC Regional Office is:

Merit Systems Protection Board
1800 Diagonal Road, Suite 205
Alexandria, VA 22314-2840
(703) 756-6250 - Telephone
(703) 756-7112 - Fax

If you file an appeal, you should advise the MSPB to direct any correspondence to:

Kerry Creighton, Attorney
Branch of Personnel Litigation
Division of General Law
Office of the Solicitor
1849 C Street, N.W. - Mail Stop 6457
Washington, DC 20240
(202) 208-5620 - Telephone
(202) 208-3230 - Fax

If you have any questions about the procedures or in the appeal process, you may contact Larry Hudson, Human Resources Specialist, Office of Human Resources, Division of Labor and Employee Relations, (202) 354-1910.

Please sign and date the acknowledgement copy of this memorandum. By doing so, you will be neither forfeiting any of the rights mentioned in this memorandum nor indicating agreement or disagreement with its contents. Failure to sign will not void the contents of this memorandum.

Receipt Acknowledged:

_____        _____

Reginald E. Vance                           Date

Or

2. Employee chose not to sign as receiving the memorandum. I certify that the memorandum was given or mailed to the employee on this date:

_____        _____

Larry Curran                                Date

Cc: Russell J. Gaspar, Attorney
    1055 Thomas Jefferson Street, NW, Suite 504
    Washington, DC 20007

10

# Exhibit D

# COHEN MOHR LLP

1055 Thomas Jefferson Street, NW, Suite 504
Washington, DC 20007
Voice: (202) 342-2550
Fax: (202) 342-6147
www.cohenmohr.com
rgaspar@cohenmohr.com

**Partners**
David S. Cohen
Andrew J. Mohr
Victor G. Klingelhofer
William F. Savarino
Russell J. Gaspar
Daniel H. DuVal
Tenley A. Carp

**Of Counsel**
Laurel A. Hockey
John J. O'Brien
C. Patteson Cardwell, IV

May 16, 2008

**BY HAND**

Joseph L. Curran
Chief Information Officer
National Park Service
1201 Eye Street, N.W.
Washington, D.C. 20005

re:    Reginald E. Vance

Dear Mr. Curran:

I am writing on behalf of Reginald E. Vance to respond to the Memorandum issued by Jeffrey S. Compton on April 21, 2008, proposing that Dr. Vance be removed from his position as a Supervisory Management and Program Analyst and from the Federal service, for misuse of his government-issued credit card.

Please note that the Memorandum incorrectly states Dr. Vance's position and grade: it is GS-0343-14, not GS-0399-14.

As this letter will discuss in more detail below, a significant number of the Specifications in the Memorandum are incorrect and cannot support a finding that Dr. Vance misused his government-issued credit card. In addition, with respect to those Specifications asserting that Dr. Vance was unable to produce supporting receipts or authorization documentation for travel expenses, please recognize that applicable federal policy requires that federal government employees maintain receipts and credit card statements for three years following payment. <u>See</u> Department of the Interior Integrated Charge Card Program Policy Manual, § 3.9. Accordingly, Dr. Vance cannot be held accountable for failing to produce receipts and authorizations for transactions dating prior to approximately July 2004, three years before the date he was first interviewed in connection with these matters. Such transactions constitute fully one-half of the total number of Specifications. However, he has, in a good faith effort, exercised due diligence to produce supporting documentation for many of the Specifications in questions.

08 1283



A member of Lawyers Associated Worldwide, an international network of closely associated law firms serving local and institutional business clients in major commercial centers throughout the world.

FILED

JUL 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 2

In addition, the interview of Vanessa West (Office of Inspector General Investigative Report, Attachment 9) reveals that when the investigators attempted to review records maintained by Ms. West relating to Dr. Vance's credit card purchases, the records were "disorganized." There were no receipts for 2003, and only a few for the period 2004-2007. Therefore, records that might have been able to explain some of the transactions at issue were not available.

Dr. Vance's responses to the individual Specifications are as follows:

<u>**Specifications 1 and 2**</u>

These specifications challenge charges totaling $ 225.42 at the Talkeetna Roadhouse and the Denali Manor Bed and Breakfast during the period July 17-19, 2001. These transactions were six years old at the time of Dr. Vance's initial interview, and he had not retained copies of receipts or authorizations relating to them. During his interview on December 19, 2007, Dr. Vance stated that every time he went to the Denali Manor it was in connection with official travel. Investigative Report, Exh. 11, TR at 37-38.

Although these apparently were posted as individual charges to his credit card transaction list, that designation is erroneous. Dr. Vance recalls that these charges were in fact incurred in connection with official travel to Denali National Park to assist Clara Wooden, who was then the NPS Youth Conservation Corps Coordinator in Alaska, in connection with Youth Conservation Corps training and/or fee audits. An affidavit from Mrs. Wooden, who is currently the Assistant Regional Director for Equal Employment Opportunity for the Midwest Region of the National Park Service, supporting this is attached as **Exhibit A**. The specific YCC program at issue during July 17-19, 2001, is described in the June 28, 2001, Memorandum from Ms. Wooden attached as **Exhibit B**. This memorandum specifically references that the YCC group would be staying at the Denali Manor B&B. Therefore, the credit card charges at issue were proper.

<u>**Specification 3**</u>

This Specification challenges a charge of $27.01 at a Chevron facility in Cantwell, Alaska, on March 27, 2002. This transaction was over five years old at the time of Dr. Vance's initial interview, and he had not retained a copy of the receipt relating to it.

Cantwell is located just outside Denali National Park. Dr. Vance was detailed from Anchorage to Denali in August 2001 for a period of about 8 months, until approximately April 2002. See **Exhibit C**, an exchange of e-mails between Dr. Vance and Julie Wilkerson regarding the detail, which includes a reference to a travel authorization associated with the detail; **Exhibit D**, ¶ 2, Declaration of Thomas J. Ferranti, Dr. Vance's supervisor in the Alaska Region in 2001-2002, confirming the detail.

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 3

Dr. Vance believes that the charge in question is for food while performing the detail assignment at Denali, and that he was authorized to charge personal food expenses while on detail. See Investigative Report, Exh. 7 (interview with Connie Dworak). In this regard, please note that the spreadsheet listing Dr. Vance's credit card transactions that appears as Exhibit 2 to the Investigative Report includes a series of what appear to be offsetting credits and debits at the Chevron facility on the date in question, some of which bear the "D" designation, apparently representing authorized charges, and some of which bear the "I" designation, apparently representing an individual charge. It therefore appears that this charge was regarded as a valid and authorized charge initially, but was later changed. Dr. Vance does not know why this happened.

### Specification 4

This Specification asserts that while on official travel to Stone Mountain, Georgia, on July 7, 2003, Dr. Vance charged rooms at two different hotels – the Hampton Inn and the Hilton Airport – on the same night. This transaction was four years old at the time of Dr. Vance's initial interview, and he had not retained a copy of the receipts relating to it. Furthermore, it is factually incorrect – the Hilton and Hampton Inn charges are not for the same night.

Dr. Vance has obtained a copy of his Bank of America statement for the period in question, which shows that there was a one-night charge from the Hilton Airport for the evening of July 6, 2003; a one-night charge for the Hampton Inn Stone Mountain for July 7, 2003; and a four-night stay at the Marriott Stone Mountain Inn for July 7-11, 2003. **Exhibit E.** The Hilton and Marriott charges correspond to the receipts for approved charges on his travel authorization; the records show that he checked into the Hilton Airport on July 6 after arriving from Alaska, checked out on July 7, and checked into the Marriott Stone Mountain In on July 7. Investigative Report, Exh. 12; see Investigative Report, Exh. 8, at 2-3 (interview of Tom Ferranti, confirming that he and Dr. Vance spent one night at the Hilton Airport and the remainder of their stay at the Marriott).

Dr. Vance believes, based on his review of the Bank of America statement and other travel records, that he initially made a reservation to stay at the Hampton Inn in Stone Mountain, but that his travel plans changed and he and Mr. Ferranti ultimately stayed at the Marriott, requiring that he cancel the Hampton Inn reservation. The Bank of America statement reflects arrival and departure dates for both the Hilton and the Marriott, but not the Hampton Inn, which confirms this memory. Dr. Vance concludes from this that because of the change in plans he was charged for one night at the Hampton Inn as a cancellation penalty. See Investigative Report, Exh. 11, TR at 41-45. He has attempted to obtain documentation from the Hampton Inn to confirm this, but has only received a verbal confirmation that the Hampton Inn's records do not show that he was a guest at the hotel on July 7, 2003.

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 4

The Hampton Inn charge was not reimbursed to Dr. Vance, so he paid it personally and it resulted in no expense to the Government.

### Specification 5

This Specification challenges a charge of $110.00 on June 23, 2003, for Aramark Skyland 6 in Luray, Virginia. This transaction was over four years old at the time of Dr. Vance's initial interview, and he had not retained a copy of the receipt relating to it. That may also explain why the investigators could not obtain a copy of the travel authorization from the Alaska Regional Office.

When interviewed about this transaction Dr. Vance recalled that it was incurred in connection with a Project Management Information System conference that he attended, and was official travel. Investigative Report, Exh. 11, TR at 53-55. He has recovered e-mails between him, Julie Hopkins and Ellen Bullock relating to a PMIS conference at Valley Forge NHP in July 2003, and his authorized travel to participate in that conference; the travel charges were to be paid by the Alaska Regional Office. **Exhibit F**. In addition to attending the conference at Valley Forge, Dr. Vance <u>also</u> attended an earlier two-day PMIS meeting at Shenandoah National Park with Ms. Bullock. The minutes of this meeting, reflecting his participation as a representative of the Alaska Region, are attached as **Exhibit G**. His assignment to attend this meeting is confirmed by his former supervisor in Alaska, Thomas Ferranti. **Exhibit D, ¶ 3**.

The Aramark Skyland 6 is near Shenandoah National Park Headquarters. It appears that Dr. Vance's hotel charge for the meeting, which took place on May 20-21, 2003, was not posted to his government-issued credit card until the following month. This conclusion is consistent with the information on Exhibit 2 to the Investigative Report, which does not reflect a hotel charge for the meeting in May. Dr. Vance's Bank of America statements also confirm this: the June 19, 2003, statement shows that he made an ATM withdrawal for travel-related expenses at a Shenandoah banking facility on May 19, 2003, but the Aramark Skyland charge does not appear until the statement dated July 19, 2003. **Exhibit H**. Dr. Vance has attempted to obtain records relating to the charge directly from the Aramark hotel, but has been advised that they are no longer available.

### Specifications 6, 7, 8 and 18

These transactions all involve Dr. Vance's personal use of a rental car following approved government travel in July, August and September 2003, and March 2006. In each case he retained the car, which was authorized, for a brief period of personal leave following his official travel. The total amount at issue was $406.13 and, as the specifications disclose, in each case he

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 5

reimbursed the Government for the period of personal use. The reimbursement was made prior to any investigation into Mr. Vance's credit card use.

Exhibit 3 to the Investigative Report confirms that the total charges for each rental transaction were considerably larger than the portion attributed to Dr. Vance's personal use, and they are designated "D." Therefore, the car rentals were authorized.

Dr. Vance understood that his practice of reimbursing the Government for extra days of personal use of the rental cars was acceptable and allowed. Investigative Report, Exh. 10, interview with Dr. Vance dated July 12, 2007. This is confirmed by Dominic Nessi, former Chief Information Officer of the National Park Service and Dr. Vance's former supervisor, in his attached Declaration. Nessi Declaration, ¶ 3, attached as **Exhibit I.**[1] An example of how this policy was employed by other NPS personnel is attached as **Exhibit J.**

### Specification 10

Specification 10 challenges a charge of $24.00 at a Sunoco gas station in Ocean City, Maryland on April 2, 2004. There is no dispute that Dr. Vance was in Ocean City on official approved travel to attend the Department of the Interior Budget Conference. Investigative Report, Exh. 17, Travel Authorization. Based on his review of the travel authorization, which reflects that Dr. Vance was reimbursed for mileage for the trip, Dr. Vance agrees that he should not also have charged gasoline for his personal vehicle to his government-issued credit card.

### Specifications 14

Specification 14 challenges a charge of $29.00 at a CITGO gas station in Tampa, Florida, on August 5, 2005. There is no dispute that Dr. Vance was in Orlando, Florida, during that period on official approved travel to attend the Blacks in Government National Training Conference. Investigative Report, Exh. 18, Travel Authorization. He believes that he took a personal trip to Tampa while there. Investigative Report, Exh. 11, TR at 61-63. Based on his review of the travel authorization, which reflects that Dr. Vance was reimbursed for a rental car and related fuel charges for the trip, Dr. Vance agrees that he should not have charged gasoline to his government-issued credit card for the personal trip to Tampa.

### Specification 15

This Specification challenges a charge of $67.21 at Barnes and Noble in Washington, D.C., on August 17, 2005. Dr. Vance did not have the receipt for this charge at the time of his

---

[1]    The original of Mr. Nessi's Declaration apparently has been delayed in transit from California. Accordingly, a copy of the Declaration is attached as Exhibit I, and the original will be provided as soon as it arrives.

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 6

interview, but believed that it was for the purchase of books for his office. See Investigative Report, Exh. 11, TR at 64-65. Dr. Vance has attempted to obtain a copy of the Barnes and Noble receipt from the store, but was advised that it could not be retrieved. He believes that the specific books in question are Microsoft Project 2003: Carl Chatfield, Microsoft Press, 2004, and Project 2003 for Dummies: Nancy Stephenson, Wiley Publishing, 2004. The books are currently in his office.

### Specification 17

This Specification challenges a charge of $50.00 at a Sunoco gas station in Cherry Hill, New Jersey, on November 9, 2005. It contends that there was no authorized travel voucher relating to this expenditure. This is incorrect. In fact, the travel was authorized, but through Dominic Nessi, Dr. Vance's former supervisor. See Investigative Report, Exh. 11, TR at 67-69.

Mr. Nessi recalls (**Exhibit I, ¶ 4**) that Dr. Vance accompanied him and 11 interns on an official trip to the Statue of Liberty and Ellis Island during that period. A travel authorization was prepared for Mr. Nessi by Deborah Benjamin and signed by Mr. Nessi's supervisor, Donald Murphy. The authorization included the cost of two vans and all ancillary costs, including gas. Mr. Nessi also recalls that Ms. Benjamin prepared a second authorization for Dr. Vance for no cost, which he signed. Ms. Benjamin had explained to Mr. Nessi that for insurance purposes, all employees must have a travel authorization when leaving the geographic vicinity of the duty station even if there was no cost.

One of the interns became ill during the day and a decision was made for Dr. Vance to return to Washington, D.C., with one of the vans and 4 of the interns. During the return trip, Dr. Vance used his government credit card to purchase fuel for the van. It was not clear to Mr. Nessi why Ms. Benjamin did not amend the travel authorization for Dr. Vance to account for Dr. Vance having to purchase fuel. However, she was fully aware that he was accompanying Mr. Nessi and that any appropriate purchase would have been acceptable and approved by Mr. Nessi.

### Specification 20

This Specification challenges a charge of $71.99 at an Office Depot store in Baton Rouge, Louisiana, on November 24, 2006. It contends that Dr. Vance was on personal travel and that the charge was not authorized.

During his interview Dr. Vance recalled that this purchase was for equipment he needed for his government-furnished computer. See Investigative Report, Exh. 11, TR at 70-71. Mr. Nessi confirms this. He recalls specifically that in November or December of 2006, while Dr. Vance was on travel, he contacted Mr. Nessi by telephone, explained that he had lost the power cord to his laptop computer and requested authority to purchase another one. Mr. Nessi asked if

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 7

he left the cord in his office and said he would send it to Dr. Vance. However, Dr. Vance explained that he believed he may have left it in another hotel the last time he traveled. Because the cost was minimal and the laptop would need a cord for operation in the future, Mr. Nessi approved the purchase. It was his experience that NPS employees lost equipment fairly frequently, and it was typically replaced using government funds. Mr. Nessi found this occurrence no different than many others where equipment was lost by NPS employees and managers. **Exhibit I, ¶ 5**.

### Specifications 21 and 22

These Specifications challenge a hotel charge of $178.00 and a rental car charge of $462.99 on November 28, 2006, and December 3, 2006, respectively, in Baton Rouge, Louisiana. They contend that Dr. Vance was on personal travel and that the charges were not authorized.

Dr. Vance realized shortly after incurring these charges that he had improperly used his government-issued credit card rather than his personal credit card, and advised his supervisor, Dominic Nessi. Dr. Vance explained to Mr. Nessi that he was under great mental duress due to the intense work he was doing to complete his doctoral program, the financial and physical care he was providing during his Mother's continuing battle with cancer and the support he was providing for a number of siblings living in Detroit.

Mr. Nessi told Dr. Vance that there was no justification for use of a government credit card for personal reasons, no matter how severe the conditions he was facing personally. He also explained that he could not allow this to occur without some official action, and therefore issued a formal Letter of Admonishment specifying the inappropriate nature of Dr. Vance's conduct, requiring that all funds be repaid to the government as soon as possible, and warning that any repeat offense would result in a more serious penalty. **Exhibit I, ¶ 6**. Dr. Vance in fact repaid the charges in early 2007.

### Other Specifications

Specifications 9, 11, 12, 13, 16 and 19 involve minor purchases for gasoline or food that Dr. Vance inadvertently charged to his government-issued credit card between March 2004 and May 2006. Please see Point 1 in the Discussion section, below, explaining that Dr. Vance had both personal and government issued credit cards from Bank of America, and inadvertently used the government-issued card for personal use on a few occasions because of its similar appearance to his personal cards. He agrees that these purchasers were personal in nature and should not have been charged to his government-issued credit card. Dr. Vance had already reimbursed the charges in Specifications 11 ($51.25), 13 ($77.75) and 16 ($32.84) prior to the initiation of the investigation. He will immediately reimburse the remaining charges, which total $122.00.

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 8

### Discussion

The foregoing responses reveal the following:

    --      Specifications 1, 2, 3, 5, 15, 17 and 20 all involve authorized expenditures and do not represent improper use of Dr. Vance's government-issued credit card.

    --      Specification 4 involves a hotel reservation cancellation fee that was incurred in connection with official travel. Although it was charged to Dr. Vance's government-issued credit card, he paid for it personally without cost to the Government. Because this was a legitimate travel-related charge, it does not represent improper use of Dr. Vance's government-issued credit card.

    --      Specifications 6, 7, 8, and 18 involve personal use of a rental vehicle following government-authorized travel, with reimbursement by Dr. Vance to the Government for the personal days of use, in accordance with accepted NPS practice at the time. Therefore, these should not represent improper use of Dr. Vance's government-issued credit card, because the use was consistent with agency practice and cannot be regarded as a knowing or intentional violation of credit card policies.

    --      Specifications 10 and 14 involve gasoline charges incurred during official travel, but that should not have been charged to Dr. Vance's government-issued credit card because he was reimbursed for mileage for his personal vehicle or was on a personal side-trip.

    --      Specifications 21 and 22 are improper personal charges to Dr. Vance's government-issued credit card that he recognized to be unauthorized and promptly brought to the attention of his supervisor, Mr. Nessi.

    --      Specifications 9, 11, 12, 13, 16 and 19 are inadvertent personal charges that Dr. Vance acknowledges were not authorized.

The extent and nature of Dr. Vance's unauthorized use of his government-issued credit card is therefore substantially less significant in scope, amount and seriousness than Mr. Compton's Memorandum asserts.

As noted above, Dr. Vance long ago reimbursed the Park Service for most of the challenged charges, and agrees that he must reimburse the remaining unauthorized charges that have not previously been repaid. He also recognizes that some form of discipline may be appropriate because those charges were incurred. However, he disagrees that the proposed discipline – removal – is proper or warranted under all of the circumstances.

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 9

The Memorandum recognizes (at 7) that the Interior Department's Table of Penalties identifies the suggested penalty for a first offense of credit card misuse to range from a written reprimand to a 30-day suspension.[2] Nevertheless, the Memorandum proposes removal, based on Mr. Compton's conclusion that Dr. Vance "repeatedly and intentionally violated" rules relating to credit card use that he was responsible to enforce as agency A/POC for the charge card program. Dr. Vance submits that this conclusion is incorrect and an improper exercise of management discretion under the applicable factors in <u>Douglas v. Veterans Administration</u>, 5 M.S.P.B. 313 (1981). These will be addressed below.

    1.    <u>Nature and Seriousness of the Offense</u>.

The Memorandum concludes that the offense charged is very serious, because it involved multiple instances of misuse by an individual who was responsible, after January 2004, to manage the credit card program as A/POC.

The foregoing discussion demonstrates that many of the Specifications on which this conclusion was based did not, in fact, involve unauthorized use of Dr. Vance's government-issued credit card. While there are instances in which Dr. Vance did inadvertently use his card without authorization, there is no evidence to indicate intentional misuse, and in particular there is nothing at all to indicate malicious misuse of the card for personal gain.

The Memorandum suggests that the misuse was intentional because Dr. Vance had been advised that he should reimburse the Government for "certain charges," but continued to use the card improperly. In fact, the charges for which Dr. Vance reimbursed the Government involved his personal use of a rental vehicle following approved official use, under circumstances establishing that accepted practice in NPS at the time was to permit such use on a reimbursable basis. Contrary to the implication in Mr. Compton's Memorandum, this was not a circumstance in which the reimbursement request was made in connection with the identification of an improper use of the card. Other instances of unauthorized use were inadvertent and Dr. Vance was unaware of them until the investigation was conducted in the summer and fall of 2007. Furthermore, since Mr. Nessi discussed the issue of improper use with Dr. Vance in late 2006 – <u>after Dr. Vance voluntarily brought two instances of unauthorized use to Mr. Nessi's attention</u> – there have been no further improper charges.

In addition, as Dr. Vance advised the OIG investigators (Investigative Report, Exh. 10, TR at 25-26), since approximately 2000 or 2001 he has maintained personal bank accounts at Bank of America and has had personal credit cards from the Bank that look similar to his government-issued credit card. He kept those cards in his wallet with the government-issued

---

[2]    A maximum 30-day suspension was recommended by the complaining official, John Snyder, Acting Chief Information Officer. Investigative Report at 1 and Exh.1.

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 10


card. He believes that their similarity accounts for his occasional inadvertent use of the government-issued card for personal transactions, further negating intentional misuse.

Dr. Vance recognizes that his position as A/POC makes the relationship between the offense charged and his duties and responsibilities appropriately a matter of concern. However, since his discussion with Mr. Nessi at the end of 2006 he has acted carefully to insure that there has been no additional inadvertent improper use of his card. There is no issue of continuing misuse.

2.    Past Work Record.

The Memorandum describes Dr. Vance's work record as "satisfactory performance." In fact, his most recent evaluation (in January 2007) gave him a rating of 3.6 out of 4, reflecting superior performance. Earlier ratings were "successful" or "satisfactory." He is not merely an average worker, but has been recognized by his superiors to work hard and demand good results from the personnel he supervises. Dr. Vance's superior service to the federal government is further evidenced by the numerous performance awards he has received during his federal government career.

In addition, the quality of Dr. Vance's work and potential for future service to the Government is evidenced by the fact that he was selected to attend the 2008 Darlene H. Young Leadership Academy sponsored by Blacks in Government (**Exhibit K**) and is participating in the 2008 Young Leadership Program at the USDA Graduate School (**Exhibit L**).

Therefore, the suggestion in Mr. Compton's Memorandum that Dr. Vance is an average employee whose performance is entitled to no weight as a mitigating circumstance is clearly incorrect.

3.    Past Disciplinary Record

As the Memorandum recognizes, Dr. Vance has not been subject to prior disciplinary action. The Memorandum downplays this fact by asserting that Dr. Vance "repeatedly and intentionally" violated the credit card program guidelines. As demonstrated above, this contention is materially inaccurate. As a result, the Memorandum improperly fails to give any weight to this mitigating factor.

4.    Effect on the Employee's Ability to Perform at a Satisfactory Level

The Memorandum asserts that Mr. Compton has lost confidence in Dr. Vance because of "flagrant and repeated misuse" of his credit card while on a position requiring that he be trustworthy and honest. Dr. Vance appreciates that there are legitimate concerns relating to his

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 11

role as A/POC for the credit card program. However, as the above discussion has demonstrated, the record does not support a finding that he engaged in "flagrant and repeated misuse" of his government-issued credit card. The unauthorized charges were minor and inadvertent, not intentional or maliciously undertaken for personal gain. Since his December 2006 discussion with Mr. Nessi, which predated the investigation by seven (7) months, Dr. Vance has taken appropriate steps to insure that the card is used properly, and there have been no further unauthorized charges. Therefore, contrary to Mr. Compton's conclusion, this should not be a significant "aggravating factor."

5.    Consistency of Penalties

The Memorandum asserts that there are no similarly situated employees within the Office of the Chief Information Officer for comparison purposes. However, under Douglas the comparison cannot be limited to the OCIO, but must take into account the penalties imposed on other NPS employees generally who were accused of "the same or similar offenses."

Dr. Vance is aware of at least two instances in which far more egregious credit card misuse resulted only in reprimands, not suspensions or termination. Specifically, within the last three or four years an NPS employee who Dr. Vance believes was a GS-15 in the Equal Employment Opportunity Office, was reprimanded for using her government-issued credit card to withdraw funds from an ATM that were used for gambling. A similar punishment was imposed within the last year or so on an NPS human resources employee who used ATM withdrawals to pay personal bills. Both cases appear to have involved intentional and malicious misuse of the credit card for personal gain, not inadvertent misuse of the kind Dr. Vance committed. Therefore, consistency of agency penalties does not support the discipline proposed in the Memorandum.

6.    Consistency of Penalty with the Applicable Table of Penalties

As discussed above, the maximum suggested penalty in the agency table of penalties for the offense in question is a 30-day suspension. The circumstances on which the Memorandum relies to impose the ultimate penalty of separation are, as discussed above, incorrect in many material ways. Dr. Vance did not "repeatedly and intentionally" violate the credit card rules and policies, and therefore there is no basis to depart from the table of penalties.

7.    Employee Notice of Governing Rules

Dr. Vance acknowledges, as the Memorandum notes, that he received periodic training in credit card use and signed the Bank of America Agreement. He agrees that he was on notice of the applicable rules. But the implication in the Memorandum – that he intentionally misused his credit card despite his knowledge of the rules – is incorrect for the reasons discussed at length

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 12

above. His misuse reflects inadvertent mistakes, not intentional misuse in violation of known rules. Therefore, this should not be a significant "aggravating factor."

    8.    <u>Potential for Rehabilitation</u>

    As discussed above, since his conversation with Mr. Nessi in late 2006 Mr. Vance has not engaged in any further unauthorized use of his government-issued credit card. This indicates that he has taken Mr. Nessi's admonition seriously and modified his conduct accordingly. His rehabilitation <u>preceded</u> the investigation of these matters; it is no longer an issue of potential for rehabilitation.

    9.    <u>Mitigating Circumstances</u>

    The Memorandum states that Mr. Compton is not aware of any mitigating circumstances. The <u>Douglas</u> decision describes these as including "harassment, or bad faith, malice or provocation on the part of others involved in the matter." 5 M.S.P.B. at 332.

    Despite Mr. Compton's statement, the OIG investigation indicates that several of the persons who made accusations against Dr. Vance were motivated at least in part by personal animus. One in particular, Deborah Benjamin, referred to Dr. Vance as "nasty," "mean spirited," and a person who "got too big for his britches too quick." Investigative Report, Exh. 6. These personal comments suggest malice, especially because Ms. Benjamin also admitted that she thought some of Dr. Vance's credit charges were not properly authorized, but nevertheless withheld the information from Dr. Vance, Mr. Nessi or anyone else for a period of three years or more. Had these questions been raised earlier by Ms. Benjamin, as she should have done, it is entirely possible that questions regarding authorization and the availability of records to justify the charges for a number of Specifications would never have arisen.

    Ms. Benjamin's statements should be evaluated in light of the comments of Dr. Vance's supervisor in Alaska, Tom Ferranti. Mr. Ferranti stated (Investigative Report, Exh. 8) that Dr. Vance was a hard worker who was able to get things done that others could not, would not take "no" for an answer, and would not allow a lot of time to pass when trying to complete a project. As a result, some subordinates complained to him that Dr. Vance was abrasive or impatient – qualities that Mr. Ferranti himself never experienced.

    It appears clear that Ms. Benjamin disliked Dr. Vance's "get it done" approach, and had a motivation to put him in as negative a light as possible. Rather than trying to resolve potential questions with the charge card transactions when they arose, Ms. Benjamin appears to have waited to try to trap Dr. Vance at a later time. An example of this appears to be Specification 17, the gasoline charge in Cherry Hill, New Jersey, on November 9, 2005. Ms. Benjamin knew the

**COHEN MOHR LLP**

Joseph L. Curran
May 16, 2008
Page 14

For these reasons, the appropriate penalty is one that falls within the Table of Penalties guidelines. In somewhat similar circumstances involving a senior Interior Department employee (although involving a clear finding of intentional credit card misuse, which is not present here) the MSPB sustained a 15-day suspension in Baracker v. Dep't of the Interior, 70 M.S.P.R. 594 (1996). More recently, in Johnson v. Small Business Administration, 97 M.S.P.R. 571 (2004), the Board concluded that the maximum reasonable penalty for charges and circumstances analogous to those asserted here was a 30-day suspension, not removal. These cases provide clear support for the propriety of the range of sanctions identified in the Table of Penalties.

Accordingly, Dr. Vance submits respectfully that the proposal to remove him from his position as a Supervisory Management and Program Analyst and from the Federal service lacks a proper basis under applicable law, and that any penalty imposed should fall within the range of sanctions identified in the Table of Penalties.

Dr. Vance and I are available to discuss any of these matters with you, at your convenience.

Thank you for considering Dr. Vance's response.

Very truly yours,

Russell J. Gaspar
Attorney for Reginald Vance

Attachments A-M

cc:    Dr. Vance